IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ASOCIACION DE EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, <br><br> *Petitioner*, <br><br> v. <br><br> UBS FINANCIAL SERVICES INC., UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO, and UBS TRUST COMPANY OF PUERTO RICO, <br><br> *Respondents*. | Civil No. 16-02237 (PAD) |

**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' REQUEST FOR RELIEF FROM THE ARBITRATION AWARD**

Roberto C. Quiñones-Rivera
(USDC-PR No. 211512)
MCCONNELL VALDÉS LLC
270 Muñoz Rivera Ave.
Hato Rey, PR 00981
Tel: (787) 250-2604
Fax: (787) 759-2631

Peter J. Macdonald (*admitted pro hac vice*)
Ross E. Firsenbaum (*admitted pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Respondents UBS Financial Services Inc., UBS Financial Services of Puerto Rico Inc., and UBS Trust Company of Puerto Rico*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND .....................................................2

        A.      The Arbitration ......................................................................................2

        B.      Post-Award Proceedings .........................................................................4

III.    ARGUMENT .....................................................................................................4

        A.      The Standard for Judicial Review of Arbitral Awards is Narrow, and Vacatur is
                Permitted Only in Rare Circumstance Not Present Here ......................................4

        B.      Even if AEELA's Claim That the Final Award Does Not Conform to Puerto Rico
                Law Were Correct (and It is Not), That Would Not Establish the Exceptional
                Circumstances Required for Vacatur ..................................................................6

        C.      In Any Event, the Panel Correctly Applied the Relevant Legal Principles and Had
                Ample Basis to Reject AEELA's Strained Liability Theories ..............................8

        D.      AEELA's Second Line of Attack—a Claim That Two Arbitrators Were Partial—
                is Unsupported by the Law or By the Record, and is Frivolous ..........................13

                1.      The Arbitrators Disclosed All Pertinent Information and Any Purported
                        Non-Disclosures Were Immaterial ......................................................16

                a.      AEELA Has Waived Its Right to Complain About Any Arbitrator's
                        Purported Partiality ...........................................................................18

                b.      Even if AEELA's Claims Were Not Waived, They are Deficient ...........20

IV.     CONCLUSION .................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Advest, Inc. v. McCarthy,*
914 F.2d 6 (1st Cir. 1990) ................................................................. 6

*Al-Harbi v. Citibank, N.A.,*
85 F.3d 680 (D.C. Cir. 1996) ............................................................ 25

*ALS & Associates, Inc. v. AGM Marine Constructors, Inc.,*
557 F. Supp. 2d 180 (D. Mass. 2008) ............................................... 13

*ANR Coal Co. v. Cogentrix of North Carolina, Inc.,*
173 F.3d 493 (4th Cir. 1999) ................................................. 13, 14, 25

*Bangor Gas Co., LLC v. H.Q. Energy Services (U.S.) Inc.,*
695 F.3d 181 (1st Cir. 2012) ........................................................... 5, 6

*Bull HN Information Systems v. Hutson,*
229 F.3d 321 (1st Cir. 2000) ........................................................... 4, 5

*Commonwealth Coatings Corp. v. Continental Casaulty Co.,*
393 U.S. 145 (1968) .......................................................................... 25

*Consolidated Coal Co. v. Local 1643, United Mine Workers of America,*
48 F.3d 125 (4th Cir. 1995) .............................................................. 25

*Cook Industries v. C. Itoh & Co.,*
449 F.2d 106 (2d Cir. 1971) ............................................................. 20

*Delta Mine Holding Co. v. AFC Coal Properties, Inc.,*
280 F.3d 815 (8th Cir. 2001) ............................................................ 14

*Doral Financial Corp. v. Garcia-Velez,*
725 F.3d 27 (1st Cir. 2013) .......................................................... 4, 16

*Florasynth, Inc. v. Pickholz,*
750 F.2d 171 (2d Cir. 1984) .......................................................... 1, 15

*Fort Hill Builders, Inc. v. National Grange Mutual Insurance Co.,*
866 F.2d 11 (1st Cir. 1989) (per curiam) ......................................... 18

*Fowler v. Ritz-Carlton Hotel Co., LLC,*
579 F. App'x 693 (11th Cir. 2014) ...................................... 15, 22, 24

*Freeman v. Pittsburgh Glass Works, LLC,*
709 F.3d 240 (3d Cir. 2013) ................................................ 15, 17, 25

*Gambino v. Alfonso,*
    566 F. App'x 9 (1st Cir. 2014)...................................................................................15

*Garrison v. Palmas Del Mar Homeowners Ass'n, Inc.,*
    538 F. Supp. 2d 468 (D.P.R. 2008).............................................................................7

*Goldman, Sachs & Co. v. Athena Venture Partners, L.P.,*
    803 F.3d 144 (3d Cir. 2015) .....................................................................................19

*Hall Street Associates, L.L.C. v. Mattel, Inc.,*
    552 U.S. 576 (2008) ................................................................................................. 6

*JCI Communications, Inc. v. International Brotherhood of Electrical Workers, Local 103,*
    324 F.3d 42 (1st Cir. 2003)........................................................................... 14, 15, 18

*Kiewit/Atkinson/Kenny v. International Brotherhood of Electrical Workers, Local 103,*
    76 F. Supp. 2d 77 (D. Mass. 1999) ...................................................... 15, 24, 25

*Lozano v. Maryland Casualty Co.,*
    850 F.2d 1470 (11th Cir. 1988)............................................................................24, 25

*Lucent Technologies Inc. v. Tatung Co.,*
    379 F.3d 24 (2d Cir. 2004) .......................................................................................18

*Lumber Liquidators, Inc. v. Sullivan,*
    No. CIV.A. 10-11890-NMG, 2011 WL 5884252 (D. Mass. Sept. 27, 2011) ........................15

*McCarthy v. Citigroup Global Markets Inc.,*
    463 F.3d 87 (1st Cir. 2006)........................................................................................6

*Medina Betancourt v. La Cruz Azul de P.R.,*
    155 D.P.R. 735 (2001)...............................................................................................5

*Merit Insurance Co. v. Leatherby Insurance Co.,*
    714 F.2d 673 (7th Cir. 1983) ..............................................................................14, 25

*Nationwide Mutual Insurance Co. v. First State Insurance Co.,*
    213 F. Supp. 2d 10 (D. Mass. 2002) ........................................................................14

*Nationwide Mutual Insurance Co. v. Home Insurance Co.,*
    278 F.3d 621 (6th Cir. 2002) ..............................................................................14, 15

*New Regency Productions, Inc. v. Nippon Herald Films, Inc.,*
    501 F.3d 1101 (9th Cir. 2007) ..................................................................................25

*Olivella Zalduondo v. Seguros de Servicios de Salud de P.R.,*
    187 D.P.R. 625 (2013)...............................................................................................8

*P.R. Telephone Co. v. U.S. Phone Maunufacturing Corp.*,
  427 F.3d 21 (1st Cir. 2005) ............................................................................................ 6

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*,
  476 F.3d 278 (5th Cir. 2007) ........................................................................................ 23

*Raymond James Financial Services, Inc., v. Fenyk*,
  780 F.3d 59 (1st Cir. 2015) ..................................................................................... 4, 6

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
  559 U.S. 662 (2010) ............................................................................................... 4, 6

*Stone v. Bear, Stearns & Co.*,
  872 F. Supp. 2d 435 (E.D. Pa. 2012) ....................................................................... 14, 19

*Teamsters Local Union No. 42 v. Supervalu, Inc.*,
  212 F.3d 59 (1st Cir. 2000) ............................................................................................. 5

*United Steel Workers of America, Local 12003 v. Keyspan Energy Delivery*,
  No. CIV.A. 08-11928-GAO, 2009 WL 2422865 (D. Mass. Aug. 3, 2009) .............. 15, 22, 24

*University Commons-Urbana, Ltd. v. Universal Constructors Inc.*,
  304 F.3d 1331 (11th Cir. 2002) ............................................................................. 22, 24

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) ........................................................................................................ 4

*World Films, Inc. v. Paramount Pictures Corp.*,
  125 D.P.R. 352 (1990) ................................................................................................... 5

## Statutes, Codes & Regulations

9 U.S.C. § 10(a) ............................................................................................... 5, 6, 14

10 L.P.R.A. § 890(h) ............................................................................................... 8

31 L.P.R.A. § 5289 .................................................................................................. 8

OCFI Reg. No. 6078, Sec. 25.2 ............................................................................... 8

## Rules

FINRA Rule 2111(b) ................................................................................................ 9

FINRA Rule 12405 ......................................................................................... 14, 20, 21

## I.     INTRODUCTION

UBS Financial Services Inc., UBS Financial Services Inc. of Puerto Rico, and UBS Trust Company of Puerto Rico  (collectively, "UBS" or "Respondents") submit this memorandum of law in opposition to the application of Asociacion de Empleados del Estado Libre de Puerto Rico ("AEELA" or "Petitioner") to vacate the arbitral award issued on May 23, 2016, by a unanimous panel of three arbitrators (the "Panel") acting under the Code of Arbitration Procedure of the Financial Industry Regulatory Authority ("FINRA") (the "Final Award").[1]

The Final Award concluded a comprehensive and fair process encompassing detailed pre-hearing briefs, hundreds of exhibits, and 10 days of trial.  AEELA presented all the evidence it wished to offer, called and examined all the witnesses whose testimony it sought, and made all of its arguments before an experienced and impartial Panel.  In the end, though, the Panel rejected AEELA's claims, ending more than two years of proceedings.  AEELA's attack on that outcome arises not from any defect or impropriety in the underlying process, but only from dissatisfaction with the result.  AEELA's first line of attack, the alleged non-conformity with Puerto Rico law, is not grounds to vacate an award (and, in any event, the Final Award complied with the law). AEELA's second attack, a post-hoc accusation that two of the arbitrators failed to disclose information and therefore were "partial," ignores the relevant standard, mischaracterizes the record, and falsely disparages arbitrators who acted fairly and impartially.  AEELA's effort to end-run the Panel's judgment should be summarily rejected.  *See Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) (confirmation is generally a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court").

---

[1] The Final Award is attached as Exhibit E to the Petitioner's Request for Relief from the Arbitration Award.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Arbitration

AEELA commenced the arbitration with an April 18, 2014 Statement of Claim asserting violations of Section 10(b) of the Exchange Act, and of the Investment Advisers Act 1940, as well as six other causes of action.  Dkt. No. 1, Pet. Ex. D (Statement of Claim) ¶¶ 64-117.  The gravamen of AEELA's claim was that UBS caused AEELA to unsuitably acquire Puerto Rico bonds during 2010-2012 and to hold those bonds after December 2012.  *Id.* ¶¶ 29-30; Ex. 1 to Declaration of Ross E. Firsenbaum, dated July 15, 2016 (the "Firsenbaum Decl.") (Hrg. Tr. at 26:14 – 29:15).  AEELA alleged investment losses following the collapse of the Puerto Rico credit market in late 2013 and sought damages of $70 million.  Statement of Claim ¶ 42.

In response, UBS presented evidence demonstrating that AEELA was a large financial institution that carefully considered its investment portfolio, and acted through an investment committee chaired by an experienced financial expert with an MBA from the University of Michigan Business School, and who taught on the faculty of the University of Puerto Rico School of Business.  UBS emphasized that AEELA agreed contractually that it would be acting independently, that the evidence demonstrated that it did in fact act independently, including frequently rejecting UBS's recommendations, and in the end made reasonable investment decisions intended to accomplish its stated investment objectives.  The evidence also showed that AEELA ended its relationship with UBS in June of 2013 despite the portfolio's positive total returns.  Several months after AEELA replaced UBS with Merrill Lynch, the Puerto Rico credit market collapsed.  While AEELA suffered a modest percentage loss in its portfolio in 2013 (about 7%), that resulted from the unprecedented collapse of the Puerto Rico bond market.  UBS also showed that AEELA's depiction of the alleged "hold" recommendation in late 2012 was, at best, incomplete and misleading.

AEELA had every opportunity to conduct due diligence on and select the arbitrators for the Panel.  On June 27, 2014, the parties were provided three lists of ten candidates each from which three arbitrators were to be selected; each list represented a different category of arbitrator:  non-public (*i.e.*, having a background in the securities industry), public, and chair-qualified public.  In accordance with standard FINRA procedures, each side was permitted to strike four candidates from each of the three lists, ensuring that those individuals would not be appointed, and rank the remaining candidates according to preference.  FINRA provided the parties with disclosure reports for the each of the candidates, and the parties were given over three weeks to research the candidates and submit their strikes and rankings.  Following the appointment of the Panel on August 7, 2014, in accordance with these procedures, the parties accepted the composition of the Panel at a pre-hearing conference on September 17, 2014.  Arbitrator Osimetha—the principal target of AEELA's attack in its Petition—was a member of the original Panel.  Arbitrator Silverman—the other arbitrator that AEELA challenges now—joined the Panel in March 2015 (replacing one of the original arbitrators) after a similar process by which the parties were provided a list of candidates and permitted to strike and rank names according to their preference.

During the course of the proceedings, AEELA sought extensive discovery, and in response UBS produced over nine million pages of documents.  After resolving all discovery disputes, and with the exchange of detailed pre-hearing briefs, the hearing began on April 25, 2016.  After 10 days of trial, and the submission of all the evidence and testimony AEELA wished to present, the Panel reached a unanimous decision, rejecting AEELA's account of the events and awarding zero damages.

### B.      Post-Award Proceedings

On June 3, 2016, UBS filed a motion to confirm the Final Award in the U.S. District Court for the District of Puerto Rico, which has been assigned to Judge Gelpi.[2]  *See* Civil No. 16-02017 (GAG) (the "Confirmation Action").  Notwithstanding the pending Confirmation Action, AEELA initiated this separate action in commonwealth court about three weeks later, by filing a Request for Relief from the Arbitration Award (the "Petition").  Dkt. No. 1.  UBS timely removed the Petition.  Dkt. No. 1.  On July 13, 2016, UBS filed a motion to consolidate this Action with the Confirmation Action before Judge Gelpi because this action seeks to vacate the same Final Award that the Confirmation Action seeks to confirm.  *See* Civil No. 16-02017 (GAG) Dkt. No. 18 (the "Motion to Consolidate").  On July 15, 2016, Judge Gelpi denied without prejudice UBS's Motion to Consolidate.[3]  *Id.* Dkt. No. 19.

## III.    ARGUMENT

### A.      The Standard for Judicial Review of Arbitral Awards is Narrow, and Vacatur is Permitted Only in Rare Circumstance Not Present Here

Judicial review of arbitral awards is extremely limited.  *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) ("Petitioners . . . must clear a high hurdle [to vacate an award].  It is not enough . . . to show that the panel committed an error—or even a serious error.");  *Raymond James Fin. Servs., Inc., v. Fenyk*, 780 F.3d 59, 63-64 (1st Cir. 2015)

---

[2] AEELA moved to dismiss the Confirmation Action for lack of subject matter jurisdiction.  *See* Civil No. 16-02017 (GAG) (the "Motion to Dismiss for Lack of Jurisdiction").  UBS filed its opposition to that motion on July 14, 2016.  *See id.* (the "Opposition to Respondent's Motion to Dismiss for Lack of Jurisdiction").

[3] The Order stated that UBS may renew the Motion to Consolidate if the Court determines that it has jurisdiction over that case.  Civil No. 16-02017 (GAG) Dkt. No. 19.  Per the Order, AEELA must respond, on or before August 1, 2016, to UBS's argument regarding federal jurisdiction under the *Vaden v. Discover Bank*, 556 U.S. 49 (2009) and *Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321 (1st Cir. 2000) cases cited in UBS's Motion to Consolidate.  *See id.*

("[O]ur evaluation of an arbitrator's ruling is extremely narrow and exceedingly deferential.") (internal quotation marks omitted); *Doral Fin. Corp. v. Garcia-Velez*, 725 F.3d 31 (1st Cir. 2013) ("[A]rbitral awards are nearly impervious to judicial oversight.") (quoting *Teamsters Local Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 61 (1st Cir. 2000) (internal quotation marks omitted)); *Bangor Gas Co., LLC v. H.Q. Energy Servs. (U.S.) Inc.*, 695 F.3d 181, 187 (1st Cir. 2012) ("The FAA embodies a national policy favoring arbitration, and provides only a narrow set of statutory grounds for a federal court to vacate an award.") (internal quotation marks omitted).[4]  The Federal Arbitration Act ("FAA") identifies four limited bases for vacatur:

> **(1)** where the award was procured by corruption, fraud, or undue means;
>
> **(2)** where there was evident partiality or corruption in the arbitrators, or either of them;
>
> **(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> **(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  As Section 10 plainly demonstrates, the circumstances in which an award may be vacated are exceptional and extremely limited.

While the First Circuit previously considered vacatur where arbitrators acted with a "manifest disregard of the law," *Bull HN Information Systems v. Hutson*, 229 F.3d 321, 330-31

---

[4] The policy in favor of resolving disputes through arbitration is as strong under Puerto Rico law as it is under federal principles, as the Puerto Rico Supreme Court has recognized.  *See generally Medina Betancourt v. La Cruz Azul de P.R.*, 155 D.P.R. 735, 739 (2001); *World Films, Inc. v. Paramount Pictures Corp.*, 125 D.P.R. 352, 361-62 (1990).

(1st Cir. 2000), it has since acknowledged the Supreme Court's holding that "[Section] 10 of the FAA provides the exclusive grounds under the statute for vacatur of arbitration awards," *Raymond James Fin. Servs.*, 780 F.3d at 64 (citing *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008)), and questioned whether "manifest disregard" remains a basis to overturn an arbitral award.  *See Bangor Gas*, 695 F.3d at 187 ("The manifest-disregard doctrine has been thrown into doubt by *Hall Street Associates* . . . .").  But regardless of where the "manifest disregard" doctrine stands (itself an exceedingly narrow basis for review), AEELA's attacks on the Final Award are inadequate.

**B.     Even if AEELA's Claim That the Final Award Does Not Conform to Puerto Rico Law Were Correct (and It is Not), That Would Not Establish the Exceptional Circumstances Required for Vacatur**

AEELA's claim that the Final Award does not conform to Puerto Rico law (Petition ¶¶ 44-61) cannot support an attack on an arbitral award under the FAA or controlling precedent. The FAA does not permit an award to be vacated because it does not conform to the law.  *See* 9 U.S.C. §10(a); *Stolt-Nielson* 559 U.S. at 671 ("It is not enough . . . to show . . . even a serious error."); *Raymond James Fin. Servs.*, 780 F.3d at 64 ("[S]ection 10 of the FAA provides the exclusive grounds for vacatur of arbitration awards.") (citing *Hall St. Assocs.*, 552 U.S. at 584).  Moreover, any articulation of the "manifest disregard of the law" doctrine (to the extent it continues to exist (*see* Section III.A *supra*)), does not apply to the circumstances alleged here.  "[M]anifest disregard of the law means, at its core, that 'arbitrators knew the law and explicitly disregarded it.'" *McCarthy v. Citigroup Glob. Mkts. Inc.*, 463 F.3d 87, 93 (1st Cir. 2006) (quoting *P.R. Tel. Co. v. U.S. Phone Mfg. Corp.*, 427 F.3d 21, 32 (1st Cir. 2005)). Accordingly, "there must be some showing in the record, *other than the result obtained*, that the arbitrators knew the law and expressly disregarded it."  *Id.* (quoting *Advest, Inc. v. McCarthy*, 914 F.2d 6, 10 (1st Cir. 1990)) (emphasis added).  AEELA makes no attempt to show that the

Panel knew and disregarded the law—it simply rehashes meritless arguments that were considered and properly rejected. Moreover, as is typical in FINRA arbitrations, the Final Award did not include a statement of the Panel's reasoning. AEELA can point to nothing, besides the legally irrelevant fact that its claims were denied, to show that any law was disregarded.

AEELA's contention that the parties agreed that any award must conform to the law and therefore non-conformity is grounds for vacatur (*see* Petition ¶ 44) is false. AEELA invokes a principle of Puerto Rico law that this Court has articulated as follows:

> Where the parties so provide in the arbitration agreement, arbitrators must follow rules of law and make their awards in accordance with the prevailing legal doctrines. ***If the arbitration agreement is silent with regard thereto, the arbitrators may declare law as they please, and no award will be vitiated because of their legal errors.***

*Garrison v. Palmas Del Mar Homeowners Ass'n, Inc.*, 538 F. Supp. 2d 468, 476 (D.P.R. 2008) (emphasis added). Here, the arbitration clauses are silent about conformity of the award with prevailing legal doctrines. *See* Firsenbaum Decl. Ex. 2 (Master Account Agreement) at 20-21; *id.* Ex. 3 (April 3, 2006 Consulting Agreement) at 12-13. The parties also executed agreements with FINRA to submit the dispute to arbitration and abide by the result. *Id.* Ex. 4 (April 4, 2014 AEELA Submission Agreement). Those submission agreements likewise contained no term requiring the award to conform to law. In short, AEELA has no basis to claim that the Final Award may be challenged for failure to conform to law.[5]

---

[5] AEELA also incorrectly claims that both the brokerage agreement and the consulting agreement at issue are governed by Puerto Rico law. Pet. ¶ 45. While the consulting agreement is governed by Puerto Rico law, the brokerage agreement (which was the main focus of the case) is governed by New York law: "[t]his Agreement, its enforcement and the relationship between Client and UBS Financial Services Inc. shall be governed by the laws of the State of New York, including the arbitration provisions contained herein . . . ." Firsenbaum Decl. Ex. 2 at 20.

**C.    In Any Event, the Panel Correctly Applied the Relevant Legal Principles and Had Ample Basis to Reject AEELA's Strained Liability Theories**

The Panel correctly applied the relevant law to the facts presented.  AEELA asserts in the Petition that the Final Award does not conform to three doctrines of law:  alleged fiduciary duties that UBS owed to AEELA under Puerto Rico statute, the Puerto Rico statute on negligence, and the FINRA suitability rules.  Pet. ¶¶ 48-58.  As a threshold matter, the first two claims had legal defects.  The claim of special fiduciary duties pursuant to Section 25.1 of PRUSA Regulation 6078, issued by the Puerto Rico Office of the Commission of Financial Institutions ("OCFI"), (Petition ¶¶ 48-49, 53, 56) could not have been the basis for any relief in the arbitration, because Regulation 6078 does not create a private right of action or civil remedies.  The OCFI is the only entity empowered to find violations of the regulatory standard set forth in Regulation 6078.  *See* OCFI Reg. No. 6078, Sec. 25.2 (providing that acts mentioned in the regulation "constitute actions sanctionable by the denial, suspension or revocation of the registration or any other remedy authorized by the Act, this regulation or any other applicable legal provision").  Private litigants such as AEELA may only pursue civil claims under the statutory avenues for relief found in Section 890 of PRUSA.  *See Olivella Zalduondo v. Seguros de Servicios de Salud de P.R.,* 187 D.P.R. 625, 637-38 (2013) (noting that Section 890 of PRUSA "establishes the circumstances that will create civil liability" in matters involving securities transactions"); *see also* 10 L.P.R.A. § 890(h) (noting PRUSA "does not create any cause of action not specified in [Section 890]").

Similarly, AEELA's claim that UBS acted negligently under Puerto Rico law was time-barred because such claims must be brought within one year of an alleged harm.  *See* 31 L.P.R.A. § 5289.  AEELA made its last purchase of Puerto Rico bonds in December 2012 but did not file its Statement of Claim until April 18, 2014.  Statement of Claim ¶ 50.

AEELA's attempt to allege a suitability case largely ignored the key FINRA rule governing suitability for institutional investors such as AEELA.  The operative FINRA rule is the FINRA Institutional Suitability Rule (FINRA Rule 2111(b)),[6] which provides as follows:

> A member . . . fulfills the customer-specific suitability obligation for an institutional account . . . if . . . the institutional customer is capable of evaluating investment risks independently . . . and . . . the institutional customer affirmatively indicates that it is exercising independent judgment in evaluating the member's or associated person's recommendations.

FINRA Rule 2111(b) (emphasis added).  In short, the suitability requirement for investment recommendations is satisfied for "institutions" where the institution has made it clear that it is the investment decision-maker.  Here, AEELA did that from the outset, when it executed the brokerage agreement providing that:  "Client shall make its own independent decisions regarding investments in the Account."  Firsenbaum Decl. Ex. 2 (Master Account Agreement) at 19.  FINRA has indicated that such a statement in a brokerage agreement satisfies the "affirmative indication" element of its suitability standard:  "A firm could comply with this requirement, for example, by having an institutional customer indicate in a signed customer agreement or other document that the institutional customer will be exercising independent judgment in evaluating recommendations."  *Id.* Ex. 5 (May 2012 FINRA Reg. Notice 12-25) at 17.

While a review of the underlying trial record lies far outside the scope of judicial review of arbitral awards, even a perfunctory examination of the evidence demonstrates that AEELA's claims of a breach of fiduciary duty, negligence, and unsuitability were deeply flawed.  For example, the brokerage agreement stated that AEELA "agrees that UBS Financial Services Inc. shall have no authority or responsibility to act as a 'fiduciary' . . . ."  *Id.* Ex. 2 (Brokerage

---

[6] NASD Rule 2310 (Suitability) was superseded by FINRA Rule 2111 in July 2012.  *See* May 2012 FINRA Regulatory Notice 12-25.  Firsenbaum Decl. Ex. 5.

Agreement) at 19.   AEELA itself was knowledgeable, received reasonable advice, made independent investment decisions, and purchased securities designed to achieve its investment goals and to meet the objectives set forth in AEELA's detailed, written investment policy. AEELA had sophisticated structures in place to govern investment decision-making that were described in detail in its written Investment Policy, including the functions and responsibilities of the Board of Directors, the Executive Director, the Investment Committee, the Administration and Fiscal Policy Committee, the Investment Consultant, and others, in connection with managing AEELA's investments.  *Id.* Ex. 6 (2011 AEELA Investment Policy) at 3, 12-21.  It conferred investment decision-making authority on the Executive Director but directed that the Investment Committee "evaluate[] and recommend[] the financial decisions to the Executive Director, as well as to the Administration and Fiscal Policy Committee and to the Board of Directors."  *Id.* Ex. 6, Art. VII.

In addition to affirming in the brokerage agreement that it was making "its own independent decisions regarding investments," AEELA, by its conduct, also affirmatively demonstrated to UBS that it was exercising independent judgment in evaluating investment recommendations.  *Id.* Ex. 2 (Brokerage Agreement) at 19.  For example, AEELA often considered and then rejected UBS's recommendations.  *See, e.g.*, *id.* Ex. 7 (Dec. 7, 2012 Inv. Comm. Minutes) at 2-3 (rejecting UBS's recommendation to buy particular bonds).  When AEELA received investment proposals it informed UBS that it had to convene a meeting of the AEELA Investment Committee to evaluate them, and did so.  *See*, *e.g.*, *id.* Ex. 9 (June 13, 2012 Email); Ex. 10 (Nov. 22, 2011 Email).  UBS also presented empirical data showing that for 85% of UBS's recommendations (33 out of 39), AEELA declined to follow the advice, in whole or in part.  *Id.* Ex. 1 (Hrg. Tr. at 2634).  AEELA Investment Committee meeting minutes and memos

described the Committee's own independent assessments of particular proposals. *See*, *e.g.*, *id.* Ex. 11 (April 15, 2010 Inv. Comm. Memo); Ex. 11 (Feb. 15, 2012 Inv. Comm. Memo). When UBS once suggested that it be granted discretion to select investments, AEELA swiftly shot down the proposal, emphasizing in internal Investment Committee minutes that "[t]his is equivalent to being a manager, and UBS is not a manager. . . . this would not be in accordance with what UBS is." *Id.* Ex. 7 (Jan. 25, 2013 Inv. Comm. Minutes) at 2.[7]

The evidence also showed that AEELA exercised its independent judgment by deciding to hold Puerto Rico bonds—at times contrary to the advice of UBS—as a means of increasing investment income. In November 2011, for example, the AEELA Executive Director demanded that the UBS Financial Advisor "explain . . . his insistence over recent weeks on selling the [Puerto Rico Electric Power Authority] bonds and buying US municipal bonds with such high premiums and a yield almost 2% lower than the one we have." *Id.* Ex. 8 (Nov. 11, 2011 email from Arnaldo Ortiz to Carlos Santiago). AEELA then rejected that advice, choosing to hold Puerto Rico Bonds instead of the recommended U.S. securities. Nearly a year later, in August 2012, the AEELA Investment Committee again expressly declined to follow UBS's recommendation to reduce Puerto Rico concentration because doing so would reduce AEELA's investment income:

> The other recommendation put forward by UBS was to evaluate the risk concentration, since the portfolio currently has 25% of its assets invested in various instruments of the Government of Puerto Rico. The Committee stated that it would evaluate this in a subsequent meeting, *but the general opinion was that it was not necessary for the present, since these are instruments which have*

---

[7] The Consulting Agreement with UBS Trust Company underscored the same point, noting that AEELA maintained "final decision-making authority and responsibility . . . for the implementation of any investment plan or strategy resulting from the services provided under this Agreement." Firsenbaum Decl. Ex. 3 at 5.

> high rates of interest and if such a change were to be made, this
> would reduce the total yield of the portfolio.

Firsenbaum Decl. Ex. 7 (Aug. 29, 20123 Inv. Comm. Minutes) at 2 (emphasis added). The record was replete with examples of written recommendations by UBS to AEELA to reduce or limit its Puerto Rico exposure in light of the fact that AEELA was a tax-exempt organization, and did not need the substantial tax benefits that non-institutional Puerto Rico investors (such as individuals) received. *See* Firsenbaum Decl. Ex. 12 (UBS Pre-Hearing Brief at 21-26, citing to written recommendations to limit or reduce Puerto Rico holdings in 2009, 2010, 2011 and 2012). Indeed, after AEELA replaced UBS in mid-2013 with Merrill Lynch, one of the first notes in the AEELA Board minutes observed that Merrill recommended that AEELA start reducing PR Bonds, and that there was "a similar recommendation from the previous advisor, UBS Financial." *Id.* Ex. 13 (July 31, 2013 AEELA Executive Committee meeting minutes) at 16. It is scarcely surprising in light of this (and other) evidence that the Panel refused to find that UBS caused AEELA to be concentrated in Puerto Rico bonds and concomitantly declined to find a violation of any law or regulation.

AEELA's claim that there was a "hold" recommendation in December 2012 (Petition ¶ 47) was also contradicted by the evidence. *First*, AEELA's contention that Max Perez, then a junior broker at UBS, advised the Investment Committee not to sell bonds during a telephone conversation, was refuted by Mr. Perez:

> Q.  Okay. Now, you told the committee on December 14 [2012] when they asked you whether they should sell the Puerto Rico bonds, you told them not to, correct?
>
> A.  That is incorrect.
>
> Q.  So your testimony is you did not have a conversation with the Investment Committee on December 14?
>
> A.  Oh, I did have a conversation with the committee, but I did not

tell them to sell.  I did not tell them to hold.  I did not issue a hold recommendation at this point.

Firsenbaum Decl. Ex. 1 (Hrg. Tr. at 1376:8-19).  AEELA also mischaracterized a December 28, 2012 email from UBS as a hold recommendation (Petition ¶ 47), something the Panel correctly rejected.  AEELA ignored a vital paragraph in the email:  while UBS recommended that AEELA not sell in the "coming weeks" because of short-term, technical pressures on the market, UBS did recommend that AEELA sell Puerto Rico bonds in the "coming months."  Firsenbaum Decl. Ex. 14 (Dec. 28, 2012 email from Juan Pablo Perez [UBS] to AEELA Inv. Comm.) at 2.  The evidence showed that AEELA opted not to follow UBS's advice to sell bonds at that point, just as it had before.  *Id.* Ex. 1 (Hrg. Tr. at 779:16 – 780:16).

These examples from the record reflect—overwhelmingly—that the Panel had ample grounds to rule in favor of UBS.  But even if that were not the case, the role of a court reviewing an arbitral award is very limited.  Unless one of the narrow and specific elements of Section 10 of the FAA are implicated, and none is here, the Final Award must stand.  AEELA's claims of legal error, while unsupported by the law and contrary to the plain record of the case are, in any event, legally meaningless.  They should be rejected.

### D.    AEELA's Second Line of Attack—a Claim That Two Arbitrators Were Partial—is Unsupported by the Law or By the Record, and is Frivolous

AEELA's other argument for vacatur of the Final Award is that two of the Panel members failed to disclose information that AEELA maintains was material.  Pet. ¶¶ 22-30.  This argument is legally invalid as well.  An arbitrator's purported failure to disclose information is not grounds for vacatur under 9 U.S.C. § 10.  *See ANR Coal Co. v. Cogentrix of N.C., Inc.*, 173 F.3d 493, 497 (4th Cir. 1999) (Section 10 of the FAA "makes no mention of an arbitrator's failure to disclose information as a basis for vacating an arbitration award.").  "[A]n arbitrator's failure to disclose, in and of itself, provides no basis to vacate an award."  *ALS & Assocs., Inc. v.*

*AGM Marine Constructors, Inc.*, 557 F. Supp. 2d 180, 184 (D. Mass. 2008) (quoting *ANR Coal*, 173 F.3d at 495) (internal quotation marks omitted).   An arbitrator's "nondisclosure, even of [material and relevant] facts, has no independent legal significance and does not in itself constitute grounds for vacating an award." *ANR Coal*, 173 F.3d at 499.   Nor does an arbitrator's failure to comply with any arbitration rules or ethical codes, including any duties to disclose under such rules or codes (such as FINRA Rule 12405), provide grounds for vacating an arbitration award.   *See, e.g., Nationwide Mut. Ins. Co. v. First State Ins. Co.*, 213 F. Supp. 2d 10, 17 (D. Mass. 2002) ("[I]t is well-settled that only the statutory grounds in § 10(a) of the [Federal Arbitration] Act justify vacating an award; arbitration rules and ethical codes do not have the force of law.") (quoting *Delta Mine Holding Co. v. AFC Coal Props., Inc.,* 280 F.3d 815, 820 (8th Cir. 2001); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th Cir. 1983) ("[E]ven if the failure to disclose was a material violation of the ethical standards applicable to arbitration proceedings, it does not follow that the arbitration award may be nullified judicially.").

Thus, the alleged violations of disclosure rules and requirements under FINRA arbitration rules or Puerto Rico arbitration laws on which the Petition is based are relevant only if they demonstrate "evident partiality or corruption in the arbitrators," 9 U.S.C. § 10(a), and thus provide a statutory basis under the FAA to vacate the Final Award.   AEELA's repeated invocation of the term "apparent bias" in the Petition, while devoid of any factual basis, is also legally irrelevant.   The First Circuit explicitly defines "evident partiality" as "more than just the appearance of possible bias."   *JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Local 103*, 324 F.3d 42, 51 (1st Cir. 2003); *see also Stone v. Bear, Stearns & Co.*, 872 F. Supp. 2d 435, 446-47 (E.D. Pa. 2012) ("The statute says '*evident* partiality,' not 'potential partiality' or 'the appearance of partiality.'").   Evident partiality is demonstrated only when "a reasonable person

- 14 -

would have to conclude that an arbitrator was partial to one party to an arbitration." *JCI Commc'ns*, 324 F.3d at 51 (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.,* 278 F.3d 621, 626 (6th Cir. 2002)); *accord Gambino v. Alfonso*, 566 F. App'x 9, 14 (1st Cir. 2014). "[T]he 'evident partiality' exception is to be strictly construed, as it must be if the federal policy favoring arbitration is to be given full effect." *Fowler v. Ritz-Carlton Hotel Co., LLC*, 579 F. App'x 693, 697 (11th Cir. 2014) (internal quotation marks & citations omitted)).

The evident partiality standard expressed by Section 10 of the FAA requires a more stringent showing than the appearance of bias standard, which is generally applied to judges:

> The word "evident" suggests that the statute requires more than a vague appearance of bias. Rather, the arbitrator's bias must be sufficiently obvious that a reasonable person would easily recognize it. By contrast, the judicial standard requires recusal if a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This language suggests that the judicial inquiry focuses on appearances—"not on whether the judge actually harbored subjective bias."

*Freeman v. Pittsburgh Glass Works, LLC.*, 709 F.3d 240, 253 (3d Cir. 2013) (internal citations omitted); *see Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 173 (2d Cir. 1984) ("The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator.").

AEELA has the burden of establishing evident partiality, *JCI Communications*, 324 F.3d at 51, and it must show that "the alleged partiality is or was 'direct, definite, and capable of demonstration rather than remote, uncertain or speculative.'" *United Steel Workers of Am., Local 12003 v. Keyspan Energy Delivery*, No. CIV.A. 08-11928-GAO, 2009 WL 2422865, at *2 (D. Mass. Aug. 3, 2009) (quoting *Kiewit/Atkinson/Kenny v. Int'l Bhd. of Elec. Workers, Local 103,* 76 F. Supp. 2d 77, 79 (D. Mass. 1999)). AEELA must also demonstrate partiality through "evidence of an arbitrator's motive." *Lumber Liquidators, Inc. v. Sullivan*, No. CIV.A. 10-11890-NMG, 2011 WL 5884252, at *4 (D. Mass. Sept. 27, 2011). Courts do not vacate

arbitration awards "based on sheer speculation alone." *Doral Fin. Corp. v. Garcia-Velez*, 725 F.3d 27, 33 (1st Cir. 2013). AEELA has not come close to meeting this exacting standard.

### 1. The Arbitrators Disclosed All Pertinent Information and Any Purported Non-Disclosures Were Immaterial

Here, the purported non-disclosures about which AEELA complains do not reach the level of appearance of bias, let alone "evident partiality." As a threshold matter, AEELA does not point to any conduct during the proceedings themselves that would even hint at partiality. Indeed, at the conclusion of the hearings, counsel for AEELA commenced his closing argument by praising the three members of the Panel:

> First of all, on behalf of my team, and certainly for AEELA, I'd like to thank you for dedicating two weeks of your lives listening to all the evidence. I know it's been sometimes difficult, ***but you guys have done a great job.***

Firsenbaum Decl. Ex. 1 (Hrg. Tr. at 2876) (emphasis added).

Counsel's statement was not a mere platitude: the Panel was attentive, respectful of the parties, and engaged in the testimony being presented. Collectively they brought decades of legal and commercial experience to the matter, and asked questions that were reasonable, relevant, and fair. *See*, *e.g.*, *id.* Ex. 1 (Hrg. Tr. at 2199:20–2205:5). On the rare instances where evidentiary issues were raised, they were resolved promptly, and almost always in favor of permitting AEELA to present all of the evidence it wished to offer. *See*, *e.g.*, *id.* (Hrg. Tr. at 883:6–884:2; 2017:22–2018:2; 2213:21–2214:2). Now, having lost a fair and open proceeding, and one in which the arbitrators had done a "great job," AEELA has attacked two arbitrators— Mr. Gerald Silverman, the Chair of the Panel, and Mr. Clement Osimetha—in what can only be viewed as a cynical gambit based on the most attenuated claims of partiality.

***Gerald Silverman***. Mr. Silverman is an experienced arbitrator, mediator, and lawyer (rated AV/Preeminent by Martindale-Hubbell). During the course of his long career he has

served as a member of the Miami Civil Service Board (including as its Chair), as a member of the Miami Zoning Board (including as its Chair), as a member of the Florida Judicial Nominating Committee, as a member of the Senior Judges Review Board of the Florida Supreme Court, and in other positions. *See* Firsenbaum Decl. Ex. 15 (Mar. 11, 2015 Silverman Disclosure) at 4. AEELA now alleges that Arbitrator Silverman failed to disclose "that he acts as an agent of an entity known as Society of Investments Lenos S.A. registered in Panama." Pet. ¶ 2. The only evidence to support this is a reference to a 1985 registration as agent (presumably for purposes of service of process) for an entity known as Sociedad Inversiones do Lenos. *See* Pet. Ex. K. How or why this would amount to a disclosable matter, let alone a basis for a claim of "corruption or evident partiality" is never explained and, in any event, does not remotely approach the high bar required of a disgruntled party seeking to upset an arbitral award. Even now, AEELA is unable to articulate how Mr. Silverman's alleged status as a registered agent for a Panamanian entity, from more than 30 years ago, affected the arbitration. AEELA's only comment is that it foreclosed "the opportunity to investigate and analyze his links to this investment entity" (Petition ¶ 30), which is just the kind of hypothetical suppositions and speculations that fall far below the applicable standard. *See Freeman*, 709 F.3d at 253.

*Clement Osimetha*. While Mr. Osimetha's background and experience is not as extensive as Chairman Silverman's, he unquestionably possesses the requisite training and experience to serve as a member of the panel in the underlying matter. He received a degree in Finance in 1992 from the University of Texas Arlington, and received his law degree in 1995 from Southern Methodist University. After serving for several years as a lawyer in the Dallas City Attorney's Office, he went on to a variety of corporate positions, principally in the

pharmaceutical industry.  *See* Pet. Ex. G at 3.  With respect to Mr. Osimetha, AEELA cites four items, that Mr. Osimetha purportedly failed to disclose, as grounds for his purported partiality:

- *First*, that UBS Global Asset Management Americas, a non-party institutional asset manager that acts on behalf of mutual funds, was listed as holding shares in Ciber, Inc. ("Ciber"), a company that Mr. Osimetha formerly worked for.  Pet. ¶ 24.
- *Second*, that UBS affiliates held shares of Invesco (a large, publicly traded investment management firm) and that Invesco, in turn, held shares of Ciber.  *Id.* ¶ 25.
- *Third*, that Mr. Osimetha's former employer DPT Laboratories has a retirement plan allegedly "managed" by UBS.  *Id.* ¶ 27.
- *Fourth*, that Mr. Osimetha's previous and current employer (as of April 2016), Axiom Law, contracts with UBS.  *Id.* ¶ 26.

Apart from mischaracterizing the facts (*see* Section III.D.1.b, *infra*), AEELA does not assert that Mr. Osimetha had actual knowledge of these attenuated relationships, nor explain how or why they would call into question Mr. Osimetha's integrity, let alone form a basis to conclude that he was "corrupt" or had demonstrated "evident partiality."  In any event, even if deemed accurate, these allegations cannot form the basis to vacate an arbitration award, both because they have been waived and because they are substantively deficient as a matter of law.

> ### a)    AEELA Has Waived Its Right to Complain About Any Arbitrator's Purported Partiality

Courts generally "will not entertain a claim of personal bias where it could have been raised at the arbitration proceedings but was not."  *JCI Commc'ns*, 324 F.3d at 51 (quoting *Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.,* 866 F.2d 11, 13 (1st Cir. 1989) (per curiam)) (internal quotation marks omitted).  Courts also generally refuse to "vacate awards because of undisclosed relationships where the complaining party should have known of the relationship, or could have learned of the relationship 'just as easily before or during the arbitration rather than after it lost its case.'"  *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 28 (2d Cir. 2004) (internal citations omitted).  The information AEELA relies upon now (shortly after the arbitration was

decided against it) was equally available before the arbitration.  This type of "sore loser" post-award behavior is impermissible, and for obvious reasons.  As the court in *Stone* explained:

> To preserve failure-to-disclose-type challenges to an arbitration award, the parties simply need to exercise as much diligence and tenacity in ferreting out potential conflicts *ex ante* (in selecting the panel) as they do *ex post* (once attacking the award becomes the sole reason to research the arbitrators).  Anything less would allow, if not encourage, sore losers to do exactly what [the losing party] did in this case: run a post-award background check on each and every arbitrator, not because he perceived any bias during the arbitration, but simply as a tactical response to losing.

872 F. Supp. 2d at 457.  *See also, e.g., Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 149-50 (3d Cir. 2015) ("A party should not be permitted to game the system by rolling the dice on whether to raise the challenge during the proceedings or wait until it loses to seek vacatur on the issue.  Nor should a party 'wait[] until [it] los[es] and then almost immediately beg[i]n scouring the internet for anything that might suggest one arbitrator or another was biased against it.' . . . [A] party may not conduct a background investigation on an arbitrator after the award with the sole motivation to seek vacatur.  If it were any other way, arbitrations would cease to have finality and result in endless hearings within hearings.") (some alterations in original) (internal citations omitted).  Thus, even if evident partiality could be demonstrated here, which it cannot, AEELA has waived it as a ground for vacatur because it never inquired or objected before the Final Award despite the opportunity to do so.

AEELA fails to assert that any of the alleged conflicts described in its Petition were somehow concealed until recently, and each of the alleged conflicts originates from connections that the arbitrators disclosed well before the final hearing.  For example, Arbitrator Osimetha disclosed his employment at Ciber in September 2015, more than five months before the final hearing.  Pet. Ex. G at 1-3.  AEELA could have easily reviewed the same public filings of Ciber and Invesco then, as it did after the Final Award rejected its claims, to investigate the issues it

raises for the first time in its Petition to Vacate.  *See* Pet. ¶¶ 24-25.  Mr. Osimetha disclosed his prior employment with Axiom and current employment at DPT Labs even earlier—at the outset of this arbitration.  *See* Firsenbaum Decl. Ex. 16 (June 27, 2014 Arbitrator List Selection with Disclosures) at 43.  AEELA could have easily looked for any connection between Axiom or DPT Labs and UBS then, as evidenced, for example, by the fact that the U.K. legal publication AEELA points to now as proof of Axiom's relationship with UBS was available on the Internet as early as 2009.[8]  *See* Pet. Ex. I at 2-3.[9]

> **b)**      **Even if AEELA's Claims Were Not Waived, They are Deficient**

AEELA's claim that FINRA's disclosure rules required disclosure of the items identified above is wrong in any event.  FINRA Rule 12405 provides that potential arbitrators "must make a reasonable effort to learn of, and must disclose to the Director, any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding," which include:

> (1) Any direct or indirect financial or personal interest in the outcome of the arbitration;
>
> (2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances with any party, any party's representative, or anyone who the arbitrator is told may be a witness in the proceeding, *that are likely to affect impartiality or might reasonably create an appearance of partiality or bias*;
>
> (3) Any such relationship or circumstances involving members of

---

[8] *See Cook Indus. v. C. Itoh & Co.*, 449 F.2d 106, 108 (2d Cir. 1971) (arbitrators need only disclose "dealings of which the parties cannot reasonably be expected to be aware, i.e., dealings 'not in the ordinary course of business.'") (internal citations omitted).

[9] AEELA now labels a disclosure by Mr. Osimetha during the arbitration of a recent job change (leaving Ciber and returning to Axiom) as "unusual" and "curious."  Pet. ¶¶ 22, 24, 26, 29.  Yet AEELA neither objected to his continued participation on the Panel nor asked to investigate the disclosure, instead remaining silent for 48 days, until after the Final Award was issued rejecting its claims.  *See* Pet. Ex. H.

> the arbitrator's family or the arbitrator's current employers, partners, or business associates; and
>
> (4) Any existing or past service as a mediator for any of the parties in the case for which the arbitrator has been selected.

FINRA Rule 12405 (emphasis added).  Nothing here alleged remotely approaches this standard.

**_Ciber and Invesco_**.  The alleged interest in Ciber, Mr. Osimetha's former employer, is miniscule:  63,739 shares (out of more than 80 million) is an infinitesimal interest in Ciber, well under 1/1000 of the company.  As for Invesco, as of March 31, 2016, UBS affiliates held about 16.4 million shares of that company,[10] which is a 3.93% stake.  Invesco—a well-known public investment management firm with nearly $800 billion in assets under management—in turn, as of March 31, 2016, owned about 7.5 million shares, or 9.3%, of Ciber.[11]  UBS affiliates' indirect holding in Ciber through Invesco was thus approximately 0.365%.  In short, the total holding in Ciber raised by AEELA is less than 1/2 of one percent of the company.

But even that tiny sliver of Ciber likely reflects no proprietary interest of UBS, and AEELA provides no evidence that it does, as is its burden here.  The presumption instead cuts the other way.  As one of the largest institutional investors and wealth management firms in the world, UBS manages the investments of millions of clients, buying and selling securities on their behalf.  While UBS affiliates, as institutional investors, may have investment discretion over the stock at issue, the UBS affiliates generally hold the shares on behalf of clients.[12]

---

[10] *See* Invesco Institutional Ownership, http://www.nasdaq.com/symbol/ivz/institutional-holdings (last visited July 14, 2016).  Although AEELA alleges that UBS owns approximately 25 million shares of Invesco, it provides no evidence for that allegation, and UBS counsel has located none.

[11] *See* Ciber Institutional Ownership, http://www.nasdaq.com/symbol/cbr/institutional-holdings (last visited July 14, 2016); Invesco Ltd. Announces May 31, 2016 Assets Under Management, http://www.invesco.com/corporate/news/financial-releases/aum-archive.

[12] *See* Firsenbaum Decl. Ex. 17 (Excerpts of Forms 13F for UBS Asset Management Americas Inc. and UBS Group AG).  Forms 13F are required to be filed "in order to increase the public

Neither logic nor common sense provides any reason to believe that Mr. Osimetha would be inclined to favor UBS because somewhere some clients of UBS affiliates held a *de minimis* position in a company he once worked for.  Nor is there any reason to think that Arbitrator Osimetha, as Ciber's Compliance Director, knew every entity that held stock in Ciber (a publicly traded company with nearly 81 million shares outstanding), let alone every company that owned stock *in the companies that owned stock* in Ciber.  AEELA has offered no evidence—only conjecture—to suggest that Mr. Osimetha knew or should have known those facts.  But to meet the evident partiality standard, "the arbitrator must be aware of the facts comprising a potential conflict." *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1341 (11th Cir. 2002); *see United Steel*, 2009 WL 2422865, at *2 ("It is not possible reasonably to think that [an arbitrator's] decision had been influenced by a relationship she was unaware of."); *Fowler*, 579 F. App'x at 697 ("If the allegations [of bias] are based on failure to disclose a potential conflict, the arbitrator must be aware of the potential conflict.").

***The DPT Laboratories Retirement Plan***.  The allegation that Arbitrator Osimetha failed to disclose that the retirement plan sponsored by his former employer (DPT Labs) is "managed by UBS who acts as broker and/or agent of the plan" also leads nowhere, both for the legal reasons outlined above, and because the assertion is demonstrably false.  *See* Pet. ¶ 27.  The retirement plan to which AEELA refers, with approximately 1400 participants and $65.1 million

---

availability of information regarding the securities holdings of institutional investors."  Division of Investment Management: Frequently Asked Questions About Form 13F, https://www.sec.gov/divisions/investment/13ffaq.htm.  The securities held by UBS reflected in its Forms 13F are generally on behalf of clients and do not reflect a proprietary position of UBS, consistent with the prohibition of proprietary trading under the "Volcker Rule."  *See* Volcker Rule Resource Center, http://www.sifma.org/issues/regulatory-reform/volcker-rule/overview (describing generally the broad prohibition on bank proprietary share ownership under the Volcker Rule).  Although the Rule has very narrow exceptions for certain technical transactions (such as hedging), AEELA presents no evidence that any of those exceptions would apply here.

in capital, is the DPT Laboratories 401(k) Plan. *See* Firsenbaum Decl. Ex. 18 (DPT Labs 401(k) Plan Form 5500) at 4, 42. As a publicly-available disclosure form makes clear, UBS does not "manage" that plan, or provide any other services to it. *Id.* Instead, UBS Financial Services Insurance Agency, a non-party UBS affiliate, was paid a modest commission ($58,886) in 2014 in connection with procuring an insurance carrier for the plan. *Id.* at 4.

AEELA's allegations, even if true, would still demonstrate no more than a "trivial" relationship whose nondisclosure could never support vacatur of an arbitration award. *See, e.g.*, *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 283 (5th Cir. 2007) ("[I]n nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding."). The notion, that UBS's provision of some minute service to the 401(k) Plan of a company where Arbitrator Osimetha had previously worked for fewer than two years could render him biased, defies logic. AEELA also offers no evidence that Mr. Osimetha was, or continued to be, a participant of that plan, or what the amount of any financial stake was. At best, UBS provided some insurance-related service to the pension plan of Mr. Osimetha's former employer, in which Mr. Osimetha *might* have participated. None of that amounts to grounds to vacate an arbitration award.

***Axiom Law***. AEELA relies on the allegation that Arbitrator Osimetha's "past and current employer, Axiom Law, provided legal services to UBS." Pet. ¶ 26. But AEELA does not show that Arbitrator Osimetha had any involvement with UBS through his employment with Axiom, or even knew (or was in a position to know) that Axiom did any work for UBS.[13] Without such knowledge, the mere fact that Axiom may have performed services for UBS cannot have

---

[13] Axiom is not a law firm; it is a global business employing approximately 1500 attorneys who it "seconds" to in-house legal departments. *See* Axiom Law,  http://www.axiomlaw.com/what-we-do/, http://www.axiomlaw.com/what-were-not/ (last visited July 10, 2016).

rendered Mr. Osimetha partial. *See Univ. Commons-Urbana*, 304 F.3d at 1341; *see also United Steel.*, 2009 WL 2422865, at \*2; *Fowler*, 579 F. App'x at 697.

AEELA provides no specific information about the alleged relationship between UBS and Axiom. It relies in part on an online article in a U.K. publication from 2009 referencing unspecified documentation work that Axiom performed for the Europe, Middle East, and Africa division of UBS. *See* Pet. Ex. I. It again defies logic that Mr. Osimetha would have been aware of this alleged relationship, which existed years before he was employed by the U.S. branch of Axiom located across the Atlantic. AEELA's only other "evidence" of supposed partiality is what appears to be a printout from the Axiom website indicating, without providing any additional detail, that Axiom has done work for UBS. *Id.* But after a review of its records, UBS could identify only a single engagement with Axiom, which concluded in 2013 (*i.e.*, that was over before this arbitration began), and which involved review of certain types of standard derivatives swap agreements unconnected with any aspect of the AEELA dispute. There is no basis to infer that Arbitrator Osimetha would have known about this minimal engagement that had ended before this arbitration even begun, let alone that he actually had any involvement with it. *Cf. Lozano v. Maryland Cas. Co.*, 850 F.2d 1470, 1472 (11th Cir. 1988) (arbitrator's "failure to disclose his law firm's representation of clients who were adversaries of" a party to the arbitration in unrelated court cases not a "breach of a duty to disclose or evidence of partiality" because "there is no evidence that [the arbitrator] was even aware that these cases existed or . . . were even active at the time the arbitration proceedings took place.").

What Petitioners present here is a far cry from the type of "direct, definite, and capable of demonstration rather than remote, uncertain or speculative" partiality that courts require to vacate an arbitration award. *See United Steel*, 2009 WL 2422865, at \*2; *Kiewit/Atkinson/Kenny*,

76 F. Supp. 2d at 79.   Courts have generally found that more significant failures to disclose information than those alleged here do not constitute "evident partiality."   *See, e.g., Freeman*, 709 F.3d at 255 (no evident partiality where arbitrator did not disclose that she had received $4,500 in campaign contributions from minority owner of a party to arbitration); *ANR Coal*, 173 F.3d at 497 (no evident partiality where the arbitrator failed to disclose that his law firm represented company that indirectly caused the dispute in the arbitration).[14]   Conversely, in cases in which courts have vacated arbitration awards due to evident partiality, the undisclosed conduct or relationships are plainly egregious.[15]

## IV.   CONCLUSION

Having heard from 12 witnesses over the course of 10 days of trial and argument, and examined hundreds of exhibits, an impartial panel unanimously concluded that AEELA's claims failed.   AEELA's attempt to have this Court now overturn the Panel's decision is frivolous. AEELA's motion to vacate the award should accordingly be denied.

---

[14] *See also Consol. Coal Co. v. Local 1643, United Mine Workers of Am.*, 48 F.3d 125, 129 (4th Cir. 1995) (no evident partiality where arbitrator failed to disclose that his brother was employee of different state local of union party to arbitration); *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680 (D.C. Cir. 1996) (no evident partiality where arbitrator failed to disclose that his former law firm represented party to the arbitration in unrelated matters); *Lozano*, 850 F.2d at 1472 (no evident partiality where the arbitrator and counsel for one of the parties were both investors in two limited partnerships and where the arbitrator's law firm represented clients that were adverse to one of the parties to the arbitration in unrelated litigation); *Merit Ins. Co.*, 714 F.2d at 676 (no evident partiality where arbitrator, a number of years before the arbitration, had worked directly under the president and principal stockholder of one of the parties for three years).

[15] *See, e.g., Commw. Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 146 (1968) (Vacating arbitration award where arbitrator failed to disclose that one of the parties was a "regular customer[]"; that the arbitrator had a "repeated and significant" business relationship with that party; and that "the relationship . . . include[d] the rendering of services on the very projects involved in [the] lawsuit."); *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1107 (9th Cir. 2007) (evident partiality where arbitrator failed to disclose that he was executive officer of film group negotiating to finance film developed by party to arbitration).

Dated: July 15, 2016
San Juan, Puerto Rico

Respectfully Submitted,


/s/ Roberto C. Quiñones-Rivera
Roberto C. Quiñones-Rivera
(USDC-PR No. 211512)
MCCONNELL VALDÉS LLC
270 Muñoz Rivera Ave.
Hato Rey, PR 00981
Tel: (787) 250-2604
Fax: (787) 759-2631

- and -

Peter J. Macdonald (*admitted pro hac vice*)
Ross E. Firsenbaum (*admitted pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
New York, New York  10007
Tel: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Respondents UBS Financial Services*
*of Puerto Rico Inc., UBS Financial Services Inc.,*
*and UBS Trust Company of Puerto Rico*